UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COLLETTE KRONNER,

    Plaintiff,

v.

McDOWELL & ASSOCIATES, INC.,

    Defendant.
                                               /

Case No. 04-74657

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

Plaintiff Collette[1] Kronner brings this action against her former employer, McDowell & Associates, Inc., for violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Defendant has moved for dismissal pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56(b). For the following reasons, the Court GRANTS Defendant's Motion.

**I.   Background**

In 1998, Plaintiff was diagnosed with Type II bipolar disorder. (Def. Ex. 3 p. 18.) She describes symptoms including "anxiety, moments of confusion, difficulty following directions, lack of focus, concentration, learning and I sleep too much." (Pl. Ex. B.) She states that she has "to think hard" to make herself focus on what she's doing, and describes her confusion as being "like rabbits running around in my head, and I have to

---

[1] Ms. Kronner's first name is spelled both "Collette" and "Colette" in the parties' moving papers, and her own briefs contain both spellings. The Court uses the spelling found in the captions of all briefs and the original complaint, "Collette."

slow the rabbits down so that I can function, so I can focus on what I am doing." (Pl. Ex. B p. 23.) "I have to study very, very, very hard to do anything." (*Id.* at 30.) Plaintiff claims that she sleeps more than the average person, going to bed at 8:00 p.m. on weekdays and sleeping in until 10:00 or 11:00 on weekends. (*Id.*)

On October 6, 2002, Plaintiff applied for a Secretary position with Defendant, an engineering firm. She described herself in her cover letter as having "excellent organizational and technical skills" and being a "quick learner." (Def. Ex. 1.) She indicated no physical or mental limitations. She was hired on October 28, 2002, to do dictation work for Defendant's engineers.

Plaintiff was initially placed on a ninety-day probationary period, meaning that senior secretaries reviewed her work to ensure accuracy. On several occasions, work was returned to Plaintiff with grammatical errors. (Def. Ex. 2.) Defendant warned Plaintiff that her work product was inadequate, and despite Plaintiff's assurances that things would improve, Defendant remained unhappy with Plaintiff's work. (Br. of Def. 7.)

Jessica Cole, who worked alongside Plaintiff, states that the quality of Plaintiff's work product varied. Cole says that Plaintiff experienced difficulties at first, but that after she "knew the ropes, her work was fine." (Pl. Ex. C p. 3.) Thus, Plaintiff was "cut loose" from the need to have her work proofread by more senior secretaries.

Later, however, Plaintiff's work began to slide, and she again needed other secretaries to proofread her documents. Cole states that after her work quality slipped, Plaintiff's documents had "a lot more mistakes in them." (*Id.* at 10.) Due to Plaintiff's inaccuracies, two other secretaries were required to proofread her work.

Ms. Cole recalls a conversation with Plaintiff at some point—she cannot recall when, except to say that it was on a Saturday—in which Plaintiff mentioned her bipolar disorder. (Pl. Ex. D p. 12.)  A few other co-workers were also aware of Plaintiff's disorder. (Pl. Ex. C p. 50-52.)  Sometime in late 2003, Plaintiff's supervisor, Mary Ann Jardine, told Plaintiff that she had seen her "staring off into space." (Pl. Ex. C p. 46.)  Plaintiff at first did not believe this, but after speaking with a therapist friend,[2] she learned that bipolar disorder can cause this type of behavior.  Around January of 2004, Plaintiff went to Ms. Jardine and told her the apparent reason for her behavior: "The reason that I stared off is because I'm bipolar.  I didn't want her to think that I was just screwing around at work." (*Id.* at 46-47.)  Aside from Ms. Jardine, Plaintiff is not aware of any other superiors with knowledge of her bipolar disorder. (*Id.* at 143.)

Plaintiff states that when she told Ms. Jardine about her bipolar disorder, things changed immediately.  "[A]s soon as I said that, the next day or the next couple of days she had me send all my work to have someone else review it all of a sudden now." (Pl. Ex. C pp. 64-65.)  Plaintiff also states that she would sometimes catch Ms. Jardine spying on her. (*Id.* at 75.)  Plaintiff concedes that this "spying" may actually have been a way for Ms. Jardine to know whether Plaintiff was staring into space, so that she could help Plaintiff correct the problem.  (The two appear to have agreed on such a plan.) (Pl. Ex. C p. 142.)

In March of 2004, Plaintiff was laid off.  Defendant claims in its briefs that its decision to terminate Plaintiff was "due to decreased work load" (Br. of Def. 7), and that "the

---

[2]This was not Plaintiff's treating therapist.  She describes this person simply as "Frank, what's his last name?  I don't know.  He's an e-mail friend from New Jersey . . . . [H]e was somebody who used to be a therapist." (Pl. Ex. C p. 47-48.)

3

decision of which secretary to terminate was based on the productivity and work quality of the various secretaries." (Reply Br. of Def. 5.) Jessica Cole describes a conversation with Ms. Jardine, in which Jardine explained her rationale for terminating Plaintiff as follows:

> Because of her work product . . . . Because we, Deana and I, were spending so much time rereading her stuff that we weren't able to do the things that we needed to do. [Ms. Jardine] wanted somebody who could sit in that chair and just do the job and get it done without have to pull any other people to check it.

(Br. of Pl. Ex. C pp. 16-17.)[3]

## II.  Standard of Review

If, pursuant to a 12(b)(6) motion, "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56." Fed. R. Civ. P. 12(b).  In support of its Motion to Dismiss, Defendant has supplied several documents and deposition transcripts.  Plaintiff has responded with evidence of her own.  The Court therefore addresses this case as a Motion for Summary Judgment under Rule 56.

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an

---

[3]Maryanne Jardine was Jessica Cole's mother, as well as her immediate supervisor. Ms. Jardine is now deceased.  (Pl. Ex. C. p. 5.)

element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which a jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III. Discussion

Plaintiff claims that she suffered an adverse employment decision on account of her disability, as is prohibited by the ADA. The ADA defines "disability" in three different ways. First, it means "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Second, it means "a record of such an impairment." *Id.* at § 12102(2)(B). And third, it means "being regarded as having such an impairment." *Id.* at § 12102(2)(C). Plaintiff argues that the ADA applies to her under either the first or third of these definitions.

As Plaintiff correctly points out, the "being regarded as" definition under Part (C) above requires *mistake* on the part of Defendant. *See Sutton v. United Air Lines*, 527 U.S. 471,

489 (1999). Thus, it is clear that Plaintiff's claims are mutually exclusive; she cannot prevail on her claim that she suffers a disability, while also prevailing on her claim that Defendant *mistakenly* believes that she suffers from a disability. Plaintiff can, of course, argue in the alternative.

### A. Plaintiff was not Disabled

Plaintiff's own facts make clear that she was not disabled under the ADA. While there is no dispute that she is "impaired," she cannot show that her impairment of bipolar disorder substantially limits a major life activity.

Plaintiff claims two major life activities that are limited by her impairment: learning and sleeping. As to the first, which is unquestionably a "major life activity," 29 C.F.R. 1630.2(i), Plaintiff relies on her deposition testimony that she has to "study very, very, very hard to do anything." Many people have to study very hard to learn new skills. Indeed, it is the rare person who is talented enough to pick up new skills without difficulty. More importantly, both Plaintiff and Jessica Cole state that Plaintiff picked up the skills of her new job, earning the trust necessary to be "cut loose" from proofreading by her co-workers. Plaintiff's allegation also contradicts her earlier description of herself as a "fast learner." Plaintiff has presented no facts to support her allegation that she is learning impaired. Based on the evidence before the Court, no reasonable jury could find that Plaintiff is substantially limited in her ability to learn.

Plaintiff also mentions her "serious problem with thinking." Again, however, the record makes clear that Plaintiff is a gifted thinker. She describes herself as a "very intelligent person" (Pl. Ex. C. 44), and given her educational and professional achievements, she

6

appears to be quite a gifted thinker.[4]  In any event, "difficulties in performing the task of concentrating do not make [one] disabled within the meaning of the ADA because concentrating is not a major life activity . . . . '[C]oncentration may be a significant and necessary component of a major life activity, such as working, learning, or speaking, but it is not an 'activity' itself.'"  *Linser v. Ohio Dep't of Mental Health*, 2000 U.S. App. LEXIS 25644 at *9 (unpublished) (quoting *Pack v. Kmart Corp*, 166 F.3d 1300, 1305 (10th Cir. 1999)).

Finally, Plaintiff argues that she sleeps too much, and therefore is substantially limited in this major life activity.  Plaintiff cites an unpublished opinion, *Boerst v. General Mills Operations*, 25 Fed. Appx. 403 (6th Cir. 2002), for the proposition that sleeping is a major life activity under the ADA.  In that case, however, the plaintiff cited his fatigue—his *inability* to sleep—as his impairment.  *Id.* at 404.  Thus, *Boerst* is easily distinguishable on its facts. More importantly, however, the Sixth Circuit concluded that the plaintiff's sleep problem, "while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation under the ADA."  The Court held that the plaintiff had "failed to show on summary judgment that he could prove a substantial limitation."  *Id.* at 407.  Far from supporting Plaintiff's position, *Boerst* support's Defendant's

---

[4]Plaintiff's accomplishments include, among other things, her current status as a Junior at Wayne State University and her having attended the St. Paul's School of Ophthalmic Technicians and the Detroit Institute of Ophthalmology.  She has been certified by the Joint Commission for Allied Health Personnel in Ophthalmology, has worked for sixteen years as an Ophthalmic Technician and Technoligist, and has published an article in *The Journal of Ophthalmic Nursing and Technology*.  Plaintiff states that she has held several demanding jobs with numerous responsibilities, including at Advanced Exhaust Technology, where as an Executive Administrative Assistant she "ran the company." (Br. of Def. 8-11 (summarizing various exhibits).)

argument that a need for lots of sleep does not constitute an "impairment" of a major life activity.[5]  Plaintiff's claim under Section 12102(2)(A) therefore fails.

### B.  Defendant did not Regard Plaintiff as Disabled

Under the ADA's third definition of "disability," Plaintiff must show that Defendant "regarded" her as disabled.  42 U.S.C. § 12102(2)(C).

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.  In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton*, 527 U.S. at 489 (citing 42 U.S.C. § 12101(7); *School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 284 (1987)).  Under either of these methods of proof, Plaintiff must show that Defendant believed (mistakenly) that she was substantially limited in a major life activity.

Plaintiff's supervisor, Ms. Jardine, unquestionably knew of Plaintiff's bipolar disorder.  But just because Ms. Jardine knew about it does not mean that she believed Plaintiff was limited in a major life activity.  Plaintiff suggests that this revelation led Ms. Jardine to subject her work to greater scrutiny:

> Defendant believed that Plaintiff could no longer type even though she had continued to perform her job without problems.  Defendant, unjustifiably, terminated Plaintiff due to problems with "work product" . . . .  Plaintiff has always denied that her work product fell off.  The alleged fall off in work product mysteriously began when Plaintiff disclosed she was bi-polar.

---

[5]As Defendant puts it, artfully if somewhat insensitively, "Plaintiff does not have an impairment in her ability to sleep; in fact, she does it quite well."  (Br. of Def. 3.)

8

(Br. of Pl. 9.)  Thus, Plaintiff now argues that Ms. Jardine believed she was substantially limited in her ability to type.  But the ability to type is not "of central importance to most people's daily lives."  *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002).  Thus, it is not a major life activity about which Defendant's belief is relevant.[6]

Plaintiff has presented evidence suggesting that Ms. Jardine might have regarded her as having difficulty concentrating, after discovering her "staring off into space."  As discussed above, however, concentrating is also not a major life activity about which Defendant's beliefs are relevant.  *Linser*, 2000 U.S. App. LEXIS 25644 at *9.[7]

Plaintiff is left to rely, therefore, on the timing of her termination as circumstantial evidence of Defendant's belief.  She told Ms. Jardine about her bipolar disorder around January of 2004, and in March that year, she was terminated for poor work quality.  This fact, standing alone, does not support a reasonable inference finding that Defendant believed Plaintiff was substantially limited in a "major life activity."  Plaintiff's claim under Section 12102(2)(C) therefore fails.

**IV.  Conclusion**

---

[6] The evidence does not support Plaintiff's contention that Ms. Jardine thought her bipolar disorder hindered her typing ability.  To the contrary, it shows that Ms. Jardine simply recognized the poor quality of Plaintiff's work.  Plaintiff admits that she experienced editing problems *prior to* telling Ms. Jardine about her disorder. (Def. Ex. 4. 140-41.)  And whether or not "Plaintiff has always denied that her work product fell off," Jessica Cole states that Plaintiff's work quality deteriorated so much that Cole "ended up having to start proofreading [Plaintiff's] work again."  (Repl. Br. of Def. Ex. 2 p. 9.)

[7] Furthermore, the evidence shows that Ms. Jardine's reaction to Plaintiff's behavior was to try to *help* Plaintiff recognize and alleviate her habit of staring.  There is no evidence that Ms. Jardine fired her for this behavior.

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above and on the record, the Court hereby GRANTS Defendant's Motion to Dismiss. Plaintiff's evidence is simply too tenuous and speculative to support a reasonable jury finding in her favor.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: December 20, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 20, 2005, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager